# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GILBERT CARDENAS, | 1:10-cv-01076-OWW-DLB (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| JAMES D. HARTLEY, | [Doc. 1] |
| Respondent. | |

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is represented by Tracy Renee Lum, Esq.

BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation (CDCR) following his conviction of kidnapping for robbery and ransom. He is serving a fourteen year-to-life sentence, plus a four year enhancement.

In the instant petition, Petitioner does not challenge the validity of his conviction; rather, he challenges the Board of Parole Hearings' February 24, 2009 decision finding Petitioner unsuitable for release.

Petitioner filed a petition for writ of habeas corpus in the Los Angeles County Superior Court challenging the Board's 2009 decision. The superior court denied the petition in a reasoned decision finding some evidence to support the Board's decision of unsuitability.

1    Petitioner then raised the same claims in a petition for writ of habeas corpus in the
2 California Court of Appeal.  The petition was denied with citations to In re Lawrence, 44 Cal.4th
3 1181 (2008) and In re Shaputis, 44 Cal.4th 1241 (2008).
4    Petitioner then filed a petition for writ of habeas corpus in the California Supreme Court,
5 which was summarily denied.
6    Petitioner filed the instant federal petition for writ of habeas corpus on June 15, 2010.
7 Respondent filed an answer to the petition on September 13, 2010, and Petitioner filed a traverse
8 on September 22, 2010.

## STATEMENT OF FACTS

10    On November 27, 1993, victim, Carrie Denise Reese called the Long Beach Police
11 Department to report she had been at the Bank of America ATM machine at San Fernando Road
12 and Sierra Highway, making a deposit.  Co-defendant, Paguada, walked toward her with a .38
13 caliber revolver.  He held it close to her stomach and told her to get into the vehicle.  She got
14 into the back of the van, and then Paguada put duct tape over her eyes and sat on the seat next to
15 her while co-defendant Sanchez and Petitioner got into the front seat and drove off.  Paguada
16 asked Reese for her pin number and he would not kill her.  He then asked her if she had children
17 and she said she had three.  Paguada told Reese to cooperate if she wanted to see her children
18 again. Paguada then went through her purse and took her money and jewelry.  Paguada stopped
19 at the bank but decided not to use the ATM because there were too many people around.  They
20 then went to buy gas.  A short time later, Petitioner stopped the van and took the victim out, then
21 tied her to a fence with duct tape and told her she would get her vehicle back.  Reese was able to
22 free herself and call police.
23    On December 7, 1993, victim, Papazian, went to an ATM machine at Bank of America at
24 Crenshaw Boulevard and Pacific Coast Highway.  He withdrew $200 and started to walk back to
25 his car.  Sanchez and Paguada approached Papazian wearing ski masks, and Papazian threw
26 down his wallet and offered his car keys.  The defendants forced the victim into the backseat of
27 the car.  One of them got beside him and covered his eyes with duct tape, and the other defendant
28 began to drive away.  They drove for a while and then stopped and were met by another vehicle.

They all got out and the victim was taken into a residence. His hands and feet were tied and he was placed into a closet. He was fed, given water to drink and taken to the restroom on a regular basis. The victim was asked for his pin number, and the defendants took his ATM and credit cards. They found his address and told him they were going to his house to get some things. They threatened to kill him and his family. One of them played Russian roulette by placing the gun in his mouth and pulling the trigger several times. Palazian was left in the closet for a total of four days. On the fourth day, the victim was taken to his home and placed in a closet. The defendants took some additional items from the house before leaving. The victim was given a knife to free himself, and was told to not turn in his credit cards for several days and to cash a $5,000 check to be taken to a certain location. He was told to follow the directions because they knew where his mother and grandmother lived. The victim was able to free himself and call police.

      On December 11, 1993, Torrance police officers went to the victim's residence and waited for a telephone call from defendants. They called at 9:07 and asked the victim if he had the money and was ready to drop it off. Palazian was directed to put the money in an envelope, then into a plastic bag, and take to a pre-arranged location to drop off. He was then to go home and wait for another phone call to tell him where he could pick up his car. Police were dispatched to the Fantastic Burger, but were spotted by the defendants. They sped away and were lost in traffic. At 11:00 p.m. that same evening, the victim received a second phone call and was told to put the money on a bus bench in front of a liquor store at Carson and Western. An officer made the money drop at midnight, and a Camaro was spotted in the area driving by several times. At 1:00 a.m. a man with a beard approached the bench, picked up the package and walked down the street. The Camaro was spotted passing the person several times but did not stop. The police detained the individual who retrieved the money. He told them that he had been walking down the street when approached by two men who said they would pay him to pick up the package.

      Officers observed the Camaro stop by a pay phone at 401 East Carlson. Victim Papazian received a phone call about that same time. Petitioner hung up the phone when he spotted the

officers. He then took off in the Camaro and was chased by officers. Petitioner finally stopped and was arrested without incident. The person who picked up the money identified both Petitioner and Sanchez as the person who asked him to pick up the money.

## DISCUSSION

### I.  Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections and Rehabilitation pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging [her] underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28

U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

II.     Review of Petition

There is no independent right to parole under the United States Constitution; rather, the right exists and is created by the substantive state law which defines the parole scheme. Hayward v. Marshall, 603 F.3d 546, 559, 561 (9th Cir. 2010) (en banc) (citing Bd. of Pardons v. Allen, 482 U.S. 369, 371 (1987); Pearson v. Muntz, 606 F.3d 606, 609 (9th Cir. 2010) (citing Wilkinson v. Austin, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005)); Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010). "[D]espite the necessarily subjective and predictive nature of the parole-release decision, state statutes may create liberty interests in parole release that are entitled to protection under the Due Process Clause." Bd. of Pardons v. Allen, 482 U.S. at 371.

In California, the Board of Parole Hearings' determination of whether an inmate is suitable for parole is controlled by the following regulations:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for a denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.
>
> (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall

> include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

Cal. Code Regs. tit. 15, §§ 2402(a) and (b). Section 2402(c) sets forth circumstances tending to demonstrate unsuitability for release. "Circumstances tending to indicate unsuitability include:

> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>
>> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
>> (C) The victim was abused, defiled or mutilated during or after the offense.
>> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.
>
> (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
>
> (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.'
>
> (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
>
> (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.
>
> (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

Cal. Code Regs. tit. 15, § 2402(c)(1)(A)-(E),(2)-(9).

> Section 2402(d) sets forth the circumstances tending to show suitability which include:
>
> (1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
>
> (2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

6

  (3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

  (4) Motivation for Crime.  The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.

  (5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

  (6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

  (7) Age.  The prisoner's present age reduces the probability of recidivism.

  (8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

  (9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

Cal. Code Regs. tit. 15, § 2402(d)(1)-(9).

  The California parole scheme entitles the prisoner to a parole hearing and various procedural guarantees and rights before, at, and after the hearing. Cal. Penal Code § 3041.5.  If denied parole, the prisoner is entitled to subsequent hearings at intervals set by statute.  Id.  In addition, if the Board or Governor find the prisoner unsuitable for release, the prisoner is entitled to a written explanation. Cal. Penal Code §§ 3041.2, 3041.5.  The denial of parole must also be supported by "some evidence," but review of the Board's or Governor's decision is extremely deferential.  In re Rosenkrantz, 29 Cal.4th 616, 128 Cal.Rptr.3d 104, 59 P.3d 174, 210 (2002).

  Because California's statutory parole scheme guarantees that prisoners will not be denied parole absent some evidence of present dangerousness, the Ninth Circuit Court of Appeals recently held California law creates a liberty interest in parole that may be enforced under the Due Process Clause.  Hayward v. Marshall, 602 F.3d at 561-563; Pearson v. Muntz, 606 F.3d at 609.  Therefore, under 28 U.S.C. § 2254, this Court's ultimate determination is whether the state court's application of the some evidence rule was unreasonable or was based on an unreasonable determination of the facts in light of the evidence.  Hayward v. Marshall. 603 F.3d at 563; Pearson v. Muntz, 606 F.3d at 608.

The applicable California standard "is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." In re Lawrence, 44 Cal.4th 1181, 1212 (2008) (emphasis in original and citations omitted). As to the circumstances of the commitment offense, the Lawrence Court concluded that

> although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

Id. at 1214.

In addition, "the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." In re Lawrence, 44 Cal.4th at 1212.

"In sum, a reviewing court must consider 'whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor.'" Cooke v. Solis, 606 F.3d at 1214 (emphasis in original) (citing Hayward v. Marshall, 603 F.3d at 560).

A.     Last Reasoned State Court Decision

In the last reasoned decision of the Los Angeles County Superior Court, the court denied the petition stating, in pertinent part:

> The Board found the Petitioner unsuitable for parole after a parole suitability hearing held on February 24, 2009. The Petitioner was denied parole for five years. The Board concluded that the Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on the commitment offense and on the Petitioner's minimization of his role in the crimes. The Court finds that there is

some evidence to support the Board's determination that the Petitioner currently presents an unreasonable risk of danger to society.

The Board determined that the commitment offense was "especially heinous, atrocious or cruel" because the Petitioner demonstrated a "callous disregard for human suffering" and because his motivation was inexplicable. See Cal. Code Regs., tit. 15 § 2281, subds (c)(1)(D) and (c)(1)(E). After committing the otherwise ordinary kidnapping for robbery, the Petitioner and his co-defendants left the first victim tied to a fence in the middle of the night without any transportation and roughly 30 minutes away from home by car. The three men then kept the second victim in a closet for four days. Moreover, the Petitioner concedes that at the time of the commitment offense, he had no criminal history, and faced no serious financial problems. The Petitioner's motivation to participate in these offenses is inexplicable given his background. His motivation to hold Mr. Papazian hostage for four days is particularly curious because the Petitioner and his co-defendants could surely have robbed the victim and burglarized his home without having to detain the victim for so long. The Petitioner asserts that he was largely motivated by a sense of loyalty to his friends, but such loyalty it seems would explain the Petitioner's silence rather than his active participation.

The Petitioner correctly notes that over time, the relevance of the commitment offense to his current dangerousness attenuates. See *In re Lawrence*, *supra*, 44 Cal.4th at 1211. The Board noted in its denial that this was the Petitioner's first suitability hearing, and found that the commitment offense weighed heavily against his suitability. The Petitioner asserts that the Board inappropriately determined that it could rely solely on the commitment offense because this was the Petitioner's first hearing. However, the Board merely noted that the level of attenuation was not as great in the Petitioner's case as in other cases where more than a quarter-century separate the hearing and the offense. Under Lawrence, the relevance of the commitment offense to current dangerousness is something of a sliding scale, and the board merely noted the Petitioner's location on that scale. As discussed below, the board then went on to address how the Petitioner's minimization of his role in the crime and his lack of credibility created a rational nexus between his commitment offense and his present risk for dangerousness. See *Id*. at 1228.

The Board admitted that its initial review of the Petitioner's impressive application inclined it to grant him parole. Nonetheless, the Board went on to explain that the Petitioner's behavior at the hearing persuaded it to deny his application instead. At his hearing, the Petitioner repeatedly minimized his level of participation. Though he attempted to portray himself as merely along for the ride, as the driver in the first kidnapping and in collecting the ransom, when his two co-defendants got out of the car to kidnap Mr. Papazian, he was unaware of what they intend[ed] to do until it was too late. This assertion, however, is contradicted by the fact that the two men had orchestrated a similar kidnapping in a bank parking lot 10 days earlier and by his statement to the a [sic] psychologist four months before the hearing that he "realized what was going to happen" when his co-defendants left the car. Similarly, after accepting the accuracy of his probation report, which stated that the Petitioner called in sick to work to guard the closet where Papazian was held, the Petitioner told the Board that he went to work every day and avoided the closet as much as possible. When confronted with the discrepancy, the Petitioner stated that he may have called in sick to work once or twice, but claimed he wanted nothing to [do] with the detention.

9

> The question before the Court is "whether some evidence supports the decision of the Board . . . that the inmate constitutes a threat to public safety." *In re Lawrence*, *supra*, 44 Cal.4th at 1212. The Petitioner's behavior was both callous and inexplicable. The Petitioner's attempts to minimize his conduct to the Board and his inconsistent assertions of fact indicate that he still lacks insight into what caused him to commit such serious offenses to begin with. Particularly given the fact that the Petitioner's motivation was inexplicable, that lack of insight is "some evidence" that the Petitioner is at risk of reoffending and that he poses an unreasonable risk to public safety. See *In re Shaputis* (2008) 44 Cal.4th 1241, 1261 [lack of insight into crime when combined with gravity of commitment offense "some evidence" of dangerousness].
>
> The Board also considered the Petitioner's post-conviction rehabilitative progress, including his participation in a multitude of self-help groups, his two vocational certifications, and his spotless disciplinary record. However, they concluded that the Petitioner would pose an unreasonable threat to public safety. Cal. Pen. Code § 3041(b). Because the Board's interpretation of the evidence is "reasonable and reflects due consideration of all relevant statutory factors," the Court must affirm the Board's judgment. *In re Shaputis*, *supra*, 44 Cal.4th at 1258.

(Ex. 2, to Answer.)

    B.    2009 Board Hearing

At Petitioner's initial parole hearing in 2009, the Board found him unsuitable based on the circumstances of the commitment offense, lack of insight, and attempt to minimize his involvement in the offense.

The commitment offenses involved multiple victims being robbed at gunpoint on separate occasions. The offenses were carried out in a dispassionate and calculated manner. After robbing both victims by gunpoint, the victims were kidnapped. The first victim had her eyes and mouth duct taped so she could not scream. She was told to cooperate if she wanted to see her children again. She was ultimately abandoned in an isolated area and tied to a fence with duct tape. The second victim was held hostage in a closet for four days with his hands and feet tied. One of the suspects played Russian roulette by placing the gun in the victim's mouth and pulling the trigger several times. Petitioner and his crime partners burglarized the home of the second victim and took several items. The victim was finally released on the fourth day and placed in a closet in his own home. However, Petitioner and his partners carried on the offense by having the second victim drop off money. The commitment offenses were clearly carried out in a cruel manner based on the fact that the victims were kidnapped, duct taped, and threatened.

The Board found that Petitioner lacked insight into the causative factors of the commitment offense. At the hearing, Petitioner continued to minimize his participation in the commitment offenses. He told the Board that he avoided contact with the second victim who was kept in the closet and claimed he went to work every day during that time. However, the probation report reflected that Petitioner stated he called in sick to watch the victim in the closet, and he later acknowledged that he may have done so.

Petitioner also said that during the robbery of the second victim, he did not know what was happening. Yet, Petitioner told the psychologist when his crime partners exited the vehicle he knew what was going to happen. He claimed that when his partners did not return, he drove and parked near the bank and fell asleep. His partners then mysteriously appeared and honked the horn to wake him up. Petitioner's version of the events are contradictory to the evidence that was before the Board, and the Board was legitimately concerned about Petitioner's insight into the causative factors of the offense.

Morever, Petitioner repeatedly stated that he went along with the offenses out of loyalty to his best friend, Mr. Sanchez. Yet, Petitioner was an active participant in the offenses and any claim to the contrary is suspect. Petitioner went to the second victim's home and stole items, which were later found at his own home. He also used the victim's credit cards to purchase items. He was later involved in picking up the ransom money from the second victim. Given that Petitioner made several contradictory statements demonstrating an attempt to minimize his involvement in the offenses, such evidence suggests that Petitioner has not yet come to terms with his conduct and remains an unreasonable risk to public safety. In <u>Shaputis</u>, the California Supreme Court stated that "[a]n inmate's version of the offense may indicate a lack of insight and provide a nexus between the offense and his current dangerousness." <u>In re Shaputis</u>, 44 Cal.4th at 1260. Here, there is some evidence to support the Board's finding that Petitioner's minimization of his participation in the commitment offenses demonstrates his current dangerousness. In determining whether Petitioner was suitable for release, the Board's purpose at the hearing is to review and analyze not only what is sad, but how it is said. Thus, Petitioner's

11

past and present attitude toward the crime was properly considered pursuant to § 2402(b). Petitioner's claim to the contrary is rejected.

The Board considered the factors in support of suitability and commended Petitioner for the progress he has made. Nevertheless, the Board concluded that the positive aspects did not outweigh the factors of unsuitability, namely, the circumstances of the commitment offense, lack of insight, and attempt to minimize his conduct. The state courts' determination that there was some evidence to support the Board's 2009 decision is not an unreasonable application of California's some evidence standard, nor an unreasonable determination of the facts in light of the record.

Petitioner contends that he was subjected to an ex post facto law violation when the Board applied Proposition 9 "Marsy's Law" to him retroactively. The Ex Post Facto Clause of the United States Constitution prohibits the states from passing any "ex post facto law," a prohibition that "is aimed at laws 'that retroactively alter the definition of crimes or increase the punishment for criminal acts.'" Cal. Dept. of Corrections v. Morales, 514 U.S. 499, 504 (1995); see also Weaver v. Graham, 450 U.S. 24, 28 (1981) (providing that "[t]he ex post facto prohibition forbids the Congress and the States to enact any law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'"). The United States Supreme Court has held that "[r]etroactive changes in laws governing parole of prisoners, in some instances, may be violative of this precept." Garner v. Jones, 529 U.S. 244, 250 (2000).

On November 4, 2008, California voters passed Proposition 9, the "Victims' Bill of Rights Act of 2008: Marsy's Law," which, *inter alia*, altered the frequency of parole hearings for prisoners not found suitable for parole. Prior to the passage of Proposition 9, in the event a prisoner was determined unsuitable for parole, a subsequent parole hearing would be held annually thereafter. Cal Penal Code § 3041.5(b)(2) (2008). If the parole board determined it was not reasonable to expect parole would be granted within the next year, it could defer rehearing for two years. Id. If the prisoner was convicted of murder and it was not reasonable to expect he/she would be granted parole within the year, the board could select a rehearing term of up to

five years. Id. Proposition 9 changed the frequency of subsequent parole hearings as follows:

> The board shall schedule the next hearing, after considering the views and interests of the victim, as follows:
>
> (A) Fifteen years after any hearing at which parole is denied, unless the board finds by clear and convincing evidence that the criteria relevant to the setting of parole release dates enumerated in subdivision (a) of Section 3041 are such that consideration of the public and victim's safety does not require a more lengthy period of incarceration for the prisoner than 10 additional years.
>
> (B) Ten years after any hearing at which parole is denied, unless the board finds by clear and convincing evidence that . . . consideration of the public and victim's safety does not require a more lengthy period of incarceration for the prisoner than seven additional years.
>
> (C) Three years, five years, or seven years after any hearing at which parole is denied, because . . . consideration of the public and victim's safety requires a more lengthy period of incarceration for the prisoner, but does not require a more lengthy period of incarceration for the prisoner than seven additional years.

Cal. Penal Code § 3041.5(b)(3) (November 4, 2008).

Petitioner claims an ex post facto violation occurred when Proposition 9 was applied to him retroactively. Prior to passage of Proposition 9, Petitioner was eligible for annual parole review hearings. Petitioner asserts that with the passage of Proposition 9, the minimum time he must serve before a subsequent parole hearing is now three years. In this case, the Court does not find an ex post facto violation.

In Morales, a California statute changed the frequency of reconsideration hearings for parole from every year to up to three years for prisoners convicted of more than one murder. 514 U.S. at 503. The Supreme Court determined the statute did not violate ex post facto because the retroactive application of the change in California law did not create "'a sufficient risk of increasing the measure of punishment attached to the covered crimes.'" Garner v. Jones, 529 U.S. 244, 250 (2000), *quoting*, Morales, 514 U.S. at 509. The Supreme Court noted that the law "did not modify the statutory punishment for any particular offenses," it did not "alter the standards for determining either the initial date of parole eligibility or an inmate's suitability for parole," and it "did not change the basic structure of California's parole law." Garner, 529 U.S. at 250, *citing*, Morales, 514 U.S. at 507. Likewise, in this case Proposition 9 did not modify the

1  punishment for Petitioner's offense of attempted murder, it did not alter his initial parole
2  eligibility date, and it did not change the basic structure of California's parole law. The board
3  must consider the same factors in determining parole suitability as before. See Cal. Penal Code
4  3041(b); Cal. Code Regs., tit. 15, § 2402(b).

5  Nevertheless as noted above, in Garner the Supreme Court found that "[r]etroactive
6  changes in laws governing parole of prisoners, in some instances, may be violative of this
7  precept." 529 U.S. at 250. In Garner, the Supreme Court determined that an amendment to
8  Georgia's parole law did not violate ex post facto even where the frequency of reconsideration
9  hearings was changed from every three years to every eight years. Id. at 256. The Court held
10 that it could not conclude that the change in Georgia law lengthened the prisoner's time of actual
11 imprisonment because Georgia law vested broad discretion with the parole board to set a
12 prisoner's date of rehearing. Id. at 254-56. In addition, the Court found it significant that the
13 parole board's own policies permitted "expedited parole reviews in the event of a change in [a
14 prisoner's] circumstance or where the Board receives new information that would warrant a
15 sooner review." Id. at 254 [Citation.].

16 Here, the California parole board is still vested with broad discretion in selecting a date
17 of rehearing from three years to 15 years. While it is true that Petitioner is no longer eligible for
18 annual parole review hearings as determined by the Board, and a date must be set at the
19 minimum of three years, the Board retains the discretion, as did the Georgia parole board in
20 Garner, to advance a hearing at any time should there be a change in circumstances. Pursuant to
21 Cal. Penal Code § 3041.5(b)(4), the Board

> may in its discretion, after considering the views and interests of the victim, advance a hearing set pursuant to paragraph (3) to an earlier date, when a change in circumstances or new information establishes a reasonable likelihood that consideration of the public and victim's safety does not require the additional period of incarceration of the prisoner provided in paragraph (3).

26 Based on the Supreme Court's holding in Garner, this Court does not find, and Petitioner has not
27 demonstrated, that Proposition 9 creates more than just a "speculative and attenuated possibility
28 of producing the prohibited effect of increasing the measure of punishment for covered crimes."

14

1  Garner, 529 U.S. at 251, *quoting*, Morales, 514 U.S. at 509.  For the above reasons, Petitioner's
2  challenge to Proposition 9 must fail.
3       With respect to Petitioner's request for an evidentiary hearing, the Court finds such a
4  hearing unnecessary. As discussed above, the existing record is more than sufficient to resolve
5  Petitioner's claims. Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir.1999); Totten v. Merkle, 137
6  F.3d 1172, 1176 (9th Cir.1998); Villafuerte v. Stewart, 111 F.3d 616, 633 (9th Cir.1997) (A
7  petitioner's request to have a federal court hear the same evidence heard by the state court in the
8  state habeas proceeding is not a valid reason for an evidentiary hearing.); Campbell v. Wood, 18
9  F.3d 662, 679 (9th Cir.1994) (An evidentiary hearing is not required on issues that can be
10 resolved by reference to the state court record.).

                              RECOMMENDATION

12     Based on the foregoing, it is HEREBY RECOMMENDED that:
13     1.     The instant petition for writ of habeas corpus be DENIED; and
14     2.     The Clerk of Court be directed to enter judgment in favor of Respondent.
15     This Findings and Recommendation is submitted to the assigned United States District
16 Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the
17 Local Rules of Practice for the United States District Court, Eastern District of California.
18 Within thirty (30) days after being served with a copy, any party may file written objections with
19 the court and serve a copy on all parties.  Such a document should be captioned "Objections to
20 Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served
21 and filed within fourteen (14) days after service of the objections.  The Court will then review
22 the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that
23 failure to file objections within the specified time may waive the right to appeal the District
24 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).
25     IT IS SO ORDERED.
26     **Dated:   October 26, 2010**           /s/ Dennis L. Beck
                                        UNITED STATES MAGISTRATE JUDGE

15